408 So.2d 724 (1982)
Woodrow TUFF, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. ZZ-371.
District Court of Appeal of Florida, First District.
January 12, 1982.
*725 Michael Allen, Public Defender, and David J. Busch, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Richard A. Patterson, Asst. Atty. Gen., for appellee.
WILLIS, BEN C., Associate Judge.
The appellant was defendant in the trial court on a charge of armed robbery of a convenience store on July 14, 1980 in Duval County. He was found guilty as charged, and thereupon was adjudged guilty and sentenced to seventy-five years imprisonment, with the Court retaining jurisdiction over one-third of the sentence. Appellant will hereafter be referred to as "defendant."
Prior to trial, defendant filed several pleadings involving attempts to suppress certain evidence, including evidence of statements made by him following his arrest. A hearing on the motions was held on November 14, 1980, when testimony was received from Detective Kearney and Officer Wilson of statements made by defendant, and the voluntariness of those statements. No ruling on the motion to suppress was made on the record immediately following this hearing, and the case was passed to a later date. On November 21, 1981 the Court made a written notation of the word "denied" on the motion. A trial jury was selected on December 15, 1980, but was not sworn until December 17, 1980, when it was convened to hear testimony. Evidence was received including testimony of Officer Kearney, regarding the voluntariness of defendant's statement. The Court then denied the motion to suppress the statement, and in overruling defendant's objection stated that it had "already ruled it's an admissible statement."
The evidence at the trial shows that an armed robbery occurred just prior to 11:00 o'clock in the evening of July 14, 1980 at a Lil Champ convenience store. At that time, a Ms. Laura Denise Mette, the only employee of the store in attendance, was preparing to close up when a black man walked in, pointed a gun at her and directed her to "put the money in the bag." The robber was wearing a brown knit turtle-neck sweater or shirt, and there was a blue towel around his neck and shoulders as a partial mask. Ms. Mette was in the process of gathering the store receipts to comply with the robber's directions when a car pulled up to the store and a customer came in. The robber then hid behind a door to the bathroom while Ms. Mette waited on the customer. The customer remarked that Ms. Mette was "as white as a sheet," and he *726 asked her what was the matter. No reply was given, and the customer left after he was served. The robber then came out, gathered up the money, estimated by Ms. Mette to be something over $150, and also taking Ms. Mette's change purse with all of her identification, left the store, stating to Ms. Mette "If you identify me I'm going to come back and get you."
The customer, a Mr. Fee, lived next door to the store. He was driving past the store at about 10:50 P.M. on the date of the robbery when he noticed a Cadillac pull in front of the complex in which he resided, and observed two black males exit the car and walk to the side of the store. He became suspicious and made a U-turn to drive up to the store. He knew Ms. Mette as an employee there, and recognized her as she was working behind the counter. He noticed that a young man was using a telephone outside the store. He observed Ms. Mette as being "white as a sheet" and not responsive, but kept glancing toward a storeroom or closet door. When he left the store, he made note of the first three letters of the Cadillac's license tag, namely, "SBS." He then went to his apartment and called the police. Ms. Mette locked the front door, and also called the police. Mr. Fee returned to the store, saw Ms. Mette in tears behind the counter. She refused to open the door until Deputy Sheriff Toohey arrived a few minutes later. The deputy received a description of the robber from Ms. Mette, and from Mr. Fee obtained the first three letters of the tag number on the Cadillac he had observed. The deputy relayed the information to the radio dispatcher. Responding officers soon stopped a Cadillac which fit the description which had been broadcast. In it were the defendant driving, and a juvenile black male as a passenger. The first officer to spot the vehicle was a Sergeant Johnson, of the Sheriff's Office, who noticed it when it was about two miles from the store which had been robbed. Sergeant Johnson was then winding up his evening shift, which terminated at 11:00 P.M. He did not participate in the arrest of the occupants of the Cadillac. As he was going off duty, the further handling of the matter was done by Deputy William Wilson and other officers who came into the investigation. When he arrived, Wilson directed everyone to stand clear of the vehicle until an evidence technician arrived. Though he was one of the arresting officers, Wilson did not advise defendant of his rights, but transported the juvenile, who had been a passenger in the car, away from the scene.
There were found in the car, a paper bag which contained $167 and a small pop-open purse with a few cents; three towels, one of which was blue; two sweaters, one of which was brown; and a lady's purse.
Both of the suspects were taken to the store of the robbery, where defendant was identified by Ms. Mette as the person who had robbed her. This occurred approximately ten or fifteen minutes after the robbery. Mr. Fee was only able to identify the juvenile as the person he saw using the telephone outside the store.
Officer Wilson did not interrogate the defendant. After the arrest was made, Wilson prepared and completed a vehicle impoundment storage report on the Cadillac, with the hold on it for robbery. He explained to defendant the purpose of the report, told him he would give him a copy, that the car was going to be stored with a hold on it for robbery, and that he needed defendant's signature on the impounding sheet. He further explained that the signature was not saying he was guilty or anything like that, but was information as to who was storing the car, the wrecker service, and where it was being taken. Defendant replied that he didn't want to sign anything and that he wanted a lawyer. Officer Wilson replied that that was "fine" and noted on the report "refused his signature" at the spot where there was a place for a signature.
Detective P.H. Kearney was one of the officers called to the arrest scene, and later he interviewed defendant in the robbery office at the police station. The officer advised defendant of his rights, including the right to have an attorney at any time *727 that he wished. No request was made by defendant for an attorney. Defendant stated that he had been riding around, and as he needed money he decided to rob the Lil Champ, and that his stepson, who was in the car with him, had nothing to do with the robbery and didn't know there was or had been a robbery. He gave some details of the robbery, which were consistent with the accounts of Ms. Mette and Mr. Fee. This interview was not recorded, but the officer was allowed to testify as to what was said. The defendant stated that the officer told him he was in serious trouble, that the officer knew he had committed the robbery, and that he was going to get the stepson sixty years. The officer denied making these threats.
Defense witnesses included defendant's wife and his girl friend. The latter testified she had been with defendant from 10:15 to 10:40 P.M. at a restaurant. The wife testified the defendant and her son left the house where they were living on the evening of July 14. Defendant testified that he made arrangements to meet his girl friend for the purpose of breaking off their relationship, and after leaving her he drove away and was soon afterward stopped by police. Defendant denied ever having worn a shirt or sweater, or having owned a gun like those introduced in evidence and which had been identified by Ms. Mette as having been on and with the defendant at the robbery.
Over strenuous objections of the defense, the State was allowed to present two rebuttal witnesses, each of whom testified that defendant had committed a robbery on them at Shoe City on July 2, 1980, and that he was wearing the brown shirt or sweater which was in evidence, and used the blue towel, also in evidence, to partially cover the gun used in the robbery. Both identified the handgun in evidence as having been the weapon used in the robbery of them.
The defendant contends the trial Court erred in allowing the State to present testimony of his alleged confession, because there was no express finding by the trial judge that the confession was voluntary, and also because he did not waive the right to have counsel present during the interrogation. He also claims error in permitting the State to use the rebuttal evidence which was presented, because of failure to give notice of intent to rely on the Williams [v. State, Fla., 110 So.2d 654] case type of evidence, and also because it involved evidence of another crime which was irrelevant to the case being tried. We affirm.
Turning to the reception of evidence of the confession, we first dispose of the point of a lack of express finding by the trial Court that the confession was given voluntarily. The judge made a written notation that the motion to suppress was denied, and later overruled an objection to the admission of testimony of the statement given, remarking that he had previously ruled the statement was admissible. It is abundantly clear that there was a sufficiently definite finding by the Court that the confession was voluntary. The very basis of the motion to suppress was a contention that it was involuntary, and conflicting evidence was presented on the issue. The denial of the motion and reception of the evidence, together with the notation of the motion and the remark of the judge, express unequivocally a requisite finding of voluntariness. The case of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) requires that there be a reliable clear-cut determination of voluntariness of a confession, including resolution of disputed facts with regard to voluntariness. In Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed. 593, it was held that the judge need not make formal findings of fact or write an opinion but "his conclusion that the confession is voluntary must appear with unmistakable clarity." Defendant relies upon McDole v. State, Fla. 1973, 283 So.2d 553 to support his contention that there was an inadequate finding of voluntariness by the Court in this case. It was held there that a trial judge's statement that a motion to suppress confessions "will be denied" together with a statement that the same evidence may be presented to the *728 jury on the issue of voluntariness, did not sufficiently indicate that the judge had made the required determination that the confessions were voluntarily given before allowing them to be considered by the jury. However, the Court there also held that even if the Court had found voluntariness, such finding would not have been supported by the evidence. The Court set forth an abundance of evidence to show flagrant coercion in obtaining the confessions. In the later case of Wilson v. State, Fla. 1974, 304 So.2d 119, the Court held that a denial of a motion to suppress was a sufficient finding of voluntariness when there was no contention or attempt made to espouse a theory of coercion, brutality or involuntariness. In Peterson v. State, Fla. 2nd DCA 1979, 372 So.2d 1017, the Court considered the statement by the Court, upon denying a motion to suppress, that it had "considered the totality of the circumstances and the testimony in the proffer," as a sufficient finding of voluntariness, and that such appeared on the record with unmistakable clarity. The Court certified to the Supreme Court the question:
"Where the voluntariness of a defendant's statement has been challenged and coercion has been alleged, must the trial judge specifically state on the record that he finds the statement to be voluntary before permitting the confession to be submitted to the jury?"
On review by the Supreme Court, it was set forth the great confusion and conflicts that had arisen on this point among the appellate decisions. It held that the lower court had correctly answered the question in the negative. The rule was recognized of the necessity that the record show with unmistakable clarity that the trial judge found that the statements were voluntary, but also stated that failure of a trial judge to recite conclusory findings of voluntariness were not fatal when the record does show "with unmistakable clarity" that the trial judge understood his responsibilities, and properly fulfilled them. Peterson v. State, Fla. 1980, 382 So.2d 701.
We deem the record here shows with unmistakable clarity that the issue of voluntariness was squarely before the Court on the motion to suppress, and that the rulings made and expressed constituted a finding of voluntariness before the evidence was presented to the jury.
The defendant further asserts that as he had indicated to Officer Wilson a desire to see a lawyer, that the interrogation by Officer Kearney was improper under the rulings of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This case holds that when an arrestee requests counsel "the interrogation must cease until an attorney is present." The case discusses the Miranda rights and the effect of an accused validly waiving his rights and giving response to interrogation. However, it observed that additional safeguards are necessary when the accused asks for counsel. The definitive holding in the case is contained in the following language:
"... and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."
In the Edwards case, the accused was arrested on robbery, burglary and murder charges. He was informed of his rights and then he gave a statement denying involvement, and presented a claim of alibi. He then sought to "make a deal" but added he wanted to speak to a lawyer before doing so. The questioning ceased and accused was taken to jail. The next day two detectives visited him in jail, and were told by the accused he didn't want to talk to anyone. He was again advised of his rights, but he heard a taped statement of an alleged accomplice. He then gave an oral statement implicating himself in the crime. The Court ruled that as Edwards had expressed a desire to deal with the police only through counsel, he was not subject to further interrogation until counsel had been made available to him.
*729 We do not view Edwards as mandating that a desire to consult a lawyer, expressed by an accused in custody but with regard to a matter unrelated to interrogation, renders wholly unlawful a subsequent interrogation by another officer who does explain in proper and adequate manner the Miranda rights. The statement of defendant of a desire for counsel was to Officer Wilson, who was not interrogating defendant but only consulting him about the impoundment storage report involving defendant's vehicle. It was in seeking his signature to the report that defendant expressed an unwillingness to sign, and mentioned a desire for legal advice. It is also significant that he refused to sign a written acknowledgement of a waiver of rights in the interrogation, but nevertheless made the statements to Officer Kearney, after being informed of his rights, including the right to have counsel present at interrogation. There is a sharp dispute in the testimony of Officer Kearney and the defendant, with the latter claiming some threats were made with reference to the stepson, and further that defendant did not admit guilt. These disputes of fact were resolved by the trial judge, and also were submitted to the jury. Furthermore, it does not appear that Officer Kearney was aware of the mention of a lawyer to Officer Wilson.
Edwards deals with a case in which the desire for a lawyer arose in connection with interrogation and after such had commenced. In the case before this Court, there was no interrogation involved at the time defendant mentioned a lawyer, and the reference was confined to the signing of a document pertaining to handling of defendant's vehicle. We do not find Edwards to be applicable here.
The last point is the claim of error in allowing the State to introduce rebuttal evidence of two witnesses who identified defendant as having committed an armed robbery on them on July 2, 1980, and also identified the brown turtle-neck sweater, the blue towel and the pistol which were in evidence as having been worn or used by defendant in the earlier robbery. The State contends the evidence was rebuttal to defendant's testimony.
The "Williams Rule," established in Williams v. State, Fla. 1959, 110 So.2d 654, states that similar fact evidence is admissible if relevant to a fact in issue, even though it points to the commission of a separate crime, subject to the exception that it is inadmissible if its sole relevancy is to establish bad character of the accused. It is deemed relevant if it tends to establish a plan, scheme, or design, or to identify defendant, or to demonstrate a plan or pattern followed by defendant in committing the type of crime charged in the case being tried.
Section 90.404(2), Florida Statutes, 1979, sets forth the pertinent rule of evidence involved here. It states, in pertinent part, as follows:
"(2) Other Crimes, Wrongs or Acts

(a) Similar fact evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, such as proof of ... preparation, plan, ... identity ... but it is inadmissible when the evidence is solely to prove bad character or propensity.
(b) 1 When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a), no fewer than 10 days before trial, the state shall furnish to the accused a written statement of the acts or offenses it intends to offer... No notice is required for evidence of offenses used for impeachment or on rebuttal. (Emphasis supplied.)
..."
We are of the view that the trial court properly admitted the evidence. It was relevant to impeach defendant's credibility and to rebut his testimony of his unfamiliarity with the sweater, towel and gun in evidence. It also was relevant under the principles of the Williams Rule and the statute to establish identity of the accused and his method of operation.
As this evidence was used for impeachment and for rebuttal, there is no *730 requirement of notice to defendant by the State of intent to offer such evidence.
We find the rulings of the trial Court, which have been challenged here, are in accordance with law, and no reversible error has been shown.
Judgment affirmed.
ROBERT P. SMITH, Jr., C.J., and MILLS, J., concur.